## Lyons v. Parkway Corp.

*Cletus P. Lyman, Michael Feltner,* and *Maura Lynch,* for plaintiff.

*James Haggerty* and *Robert LaRocca,* for defendant.

ACKERMAN, *J.,* April 17, 2001—This case was tried before a jury which found, inter alia, for the plaintiff, Carolyn Lyons, executrix for the estate of John F. Lyons, and against the Parkway defendants (Parkway Corporation and Parkway Garage Inc.) for unnamed employees as compensatory damages in the sum of $4,750,000, as follows:

Wrongful Death action—$3,750,000

Survival action—$1,000,000

The jury further found for the plaintiff, Carolyn Lyons, executrix for the estate of John F. Lyons, and against said Parkway defendants for punitive damages in the sum of $1,000,000.

The jury on the jury verdict sheet found, inter alia, that the Parkway defendants for unnamed employees were negligent and that such negligence was a substantial factor in bringing about the plaintiff's harm, and that the conduct of the defendants was outrageous so as to justify punitive damages. No request was made by plaintiff or defendants to indicate a specific verdict on the verdict sheet as to section 314A and/or section 324A of the Restatement.

Defendants filed a motion for post-trial relief in the nature of a motion for judgment n.o.v. motion for new trial and remittitur, and after argument and hearing thereon, this court denied the said motion on March 21, 2001.

Plaintiff filed a motion for Rule 238 delay damages, which was granted on March 2, 2001, in the sum of $1,069,937.50 and which was added to the previously molded total jury verdict for compensatory damages. After adding the punitive damages, the total jury verdict as molded was $6,819,937.50.

Defendants filed the instant appeal from the judgment entered by the prothonotary on March 5, 2001. (Judgment included post-verdict interest from date of verdict, October 26, 2000, at the rate of six percent per annum for per diem interest of $1,121.09 through March 5, 2001, for a total addition of $145,741.12 and a total judgment of $6,965,678.62.)

This case involves an incident that occurred on May 23, 1996, at the taxi-hold lot at Philadelphia International Airport. On that date, the plaintiff's decedent, John Lyons, a cab driver, suffered a myocardial infarction and collapsed. The plaintiff contends that a delay in summoning emergency medical assistance led to the plaintiff's eventual death 10 days later.

The plaintiff brought a cause of action in negligence against the defendants on two theories:

Firstly, under the Restatement (Second) of Torts §314A, plaintiff claims that a special relationship existed (possessor of land to business invitee) which gave rise to a duty to aid or protect the taxi-driving public, *i.e.,* Mr. Lyons, when he entered the taxi-holding lot, which the defendants held open to the taxi-driving public in response to the defendants' invitation. Plaintiff asserts that the harm Lyons suffered was a foreseeable, unreasonable risk of harm under the circumstances.

Secondly, under section 324A Restatement (Second) of Torts, plaintiff asserts that defendants were liable to Lyons for the negligent performance of an undertaking, *i.e.,* emergency communication to quickly summon emergency medical assistance which resulted in the harm to plaintiff's decedent who relied upon such undertaking.

Defendants assert the following errors:

(1) This court erred in holding as a matter of law that defendants owed a legal duty as a matter of law under Restatement (Second) of Torts §314A because of the special relations between the parties.

(2) The Restatement (Second) of Torts §314A, comment f, was not properly applied by the trial court, which should have found that the legal duty was discharged under the circumstances as a matter of law.

(3) The duties assumed by defendants, pursuant to contract, did not require the defendants to provide a safe taxi-hold lot.

(4) Defendants' conduct did not cause the injury (death) of plaintiff's decedent.

(5) Defendants' conduct did not increase the risk of harm to plaintiff's decedent under the Restatement (Second) of Torts §324A.

(6) The Restatement (Second) of Torts §324A has not been adopted as the law of Pennsylvania in non-medical malpractice cases.

(7) Punitive damages are not sustainable under mere negligence under either the Restatement (Second) of Torts §314A or the Restatement (Second) of Torts §324A.

(8) There was no or insufficient evidence that defendants' conduct was "outrageous" or "deliberately indifferent" so as to sustain an award for punitive damages.

(9) The evidence was insufficient as a matter of law to support an award of damages for pain and suffering under the survival action.

(10) Punitive damages cannot be awarded under the Wrongful Death Act.

(11) Punitive damages cannot be sustained under the Survival Act where there is no evidence of any other damages.

(12) The verdict was against the weight of the evidence.

(13) The verdict was against the law.

(14) The court committed prejudicial error when it cross-examined plaintiff's causation expert, Arthur Hayes M.D., by asking leading questions regarding the delay in summoning emergency medical assistance "caused by

the Parkway defendants" and by implying that the delay caused the death of plaintiff's decedent.

(15) Defendants' motion for remittitur should have been granted.

Restatement 314A provides in pertinent part as follows:

"Section 314A—Special relations giving rise to duty to aid or protect

"(1) duty . . . to take reasonable action

"(a) to protect them against unreasonable risk of physical harm and

"(b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others. . . .

"(3) A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation. . . ."

Comment f. to section 314A provides in pertinent part as follows:

"f. The defendant is not required to take any action until he knows or has reason to know that the plaintiff is . . . ill . . . He is not required to take any action beyond that which is reasonable under the circumstances. In the case of an ill . . . person, he will seldom be required to do more than . . . take reasonable steps to turn the sick man over to . . . those who will look after him and see that medical assistance is obtained. He is not required to give any aid to one who is in the hands of apparently competent persons who . . . are . . . apparently in a position to give him all necessary assistance."

Restatement 324A provides in pertinent part as follows:

"324A - Liability to third person for negligent performance of undertaking.

"One who undertakes, gratuitously or for consideration, to tender services to another which he should recognize as necessary for the protection of a third person . . . is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking if

"(a) his failure to exercise reasonable care increases the risk of such harm . . . ."

### A. This Court Will Not Consider on the Merits Issues Which Have Been Waived by the Defendants

(1) Defendants did *not* object at trial to the submission of the issue of punitive damages to the jury on the bases set forth in alleged errors numbers 10 and 11.

Accordingly, defendants have waived the assertion of alleged errors hereinbefore noted as numbers 10 and 11.

(2) Defendants *never* raised during trial and, therefore, waived any alleged error by this court when it questioned plaintiff's causation expert, Arthur Hayes M.D.

Accordingly, defendants waived allegation of error hereinbefore noted as number 14.

(3) Defendants have waived the argument that section 324A was not part of the law of Pennsylvania. The court noted to both counsel that the "undertaking" should be determined by the court, "I don't think that's a jury question. Do you agree with that?" Mr. Herbst (trial counsel for defendants): "Yes." (10/20/00 pp. 22-23.)

Accordingly, defendants waived allegation of error hereinbefore noted as number six.

(4) Defendants in their brief argue that the trial court erred in instructing the jury to apply section 314A, and this argument was waived at trial.

At trial, defendants' counsel stated that "My position is that section 314A is the applicable section of the Re-

statement." "It's a 314A case." (10/16/00 p. 37; 10/17/00 p. 31; 10/24/00 p. 71.) Thus, this court will not consider the merits of this argument set forth on pages 16 and 17 of defendants' brief.

### B. This Court Correctly Determined That the Defendants Owed a Legal Duty As a Matter of Law Under Restatement (Second) of Torts §314A Because of the Special Relations Between The Parties (Alleged Error Number 1)

There was no question that defendants were possessors of land who held the land open to the taxi-driving public, a member of which was plaintiff's decedent, Mr. Lyons. There was also no question that Mr. Lyons entered the land (taxi-hold lot) at the invitation of the defendants and, thus, the duty arose under section 314A as a matter of law.

Accordingly, there is no merit in the defendants' allegation of error hereinbefore noted as number 1.

### C. This Court Properly Submitted To the Jury the Question of Whether Defendants Breached the Duty They Owed To Plaintiff's Decedent Under Section 314A

Defendants suggest that comment f. of section 314A relieves the defendants of their duty as a matter of law. The jury properly found from the evidence that defendants had reason to know the plaintiff's decedent was ill; that Mr. Lyons was *not* in the hands of those who were in a position to give him *"all necessary assistance"*; and that the inaction of the defendants was not reasonable under the circumstances.

Accordingly, there is no merit in the defendants' allegation of error hereinbefore noted as number 2.

D. This Court Properly Held As a Matter of Law That Defendants Had a Contractually Assumed Duty To Provide a Safe Taxi-Hold Lot (Number 3 of Alleged Error), an Undertaking Under Section 324A

A review of the agreement to manage ground transportation services (exhibit P-3) between the City of Philadelphia and defendants reveals:

(1) That defendants under exhibit A-6 submitted a management plan for personnel and facilities and had a position of "airport dispatcher—project director" who "handles unplanned facility emergencies—project director is on call 24 hours a day, seven days a week, and that the duties and responsibilities," including "communications—develop good communication skills allowing them to communicate with . . . drivers." (emphasis supplied) See pages 29 and 30 of plaintiff's trial exhibit 3.

(2) An airport dispatcher—assistant project director who "handles emergencies—assistant director is on call 24 hours a day, seven days a week." See page 31 of plaintiff's trial exhibit 3.

(3) A booth cashier—taxi and non-taxi ground transportation whose job is to "answer telephones as necessary. Uses telephone to place calls of an emergency nature only." See page 34 of plaintiff's trial exhibit 3.

(4) The emergencies noted in the contract were not limited to *patrons,* but extended to emergencies of all types and including patrons as well as taxi drivers such as Mr. Lyons.

Defendant decided to cut the telephone wires in April 1994, and, in doing so, noted that it had unfettered authority to make such a decision. (10/24/00 pp. 45-46.)

The testimony of Thomas Keefer, defendants' vice-president of operations, was that defendants had undertaken the duty to provide the "solution" to the need to summon aid in emergencies.

On October 23, 2000, Mr. Keefer testified as follows:

"Q. So, was there a time when you made a determination or a judgment that the cell phone was not required for emergency purposes, or for any purposes in the cashier's booth in the hold lot?

"A. Yes, there was. It was probably subsequent to the memo that I had written to Charles Newkirk regarding the cell phone, getting a cell phone for the lot.

"Q. What was the basis for you making that judgment call?

"A. Any of these operational decisions I would have made after discussing them with Charles Newkirk. We would have discussed the matter, discussed the necessity of a cell phone in the booth as opposed to using walkie-talkies and weighed the advantages and disadvantages of both and came to the conclusion we would cover our operational requirements with the walkie-talkie. There were downsides for us operationally to having a cell phone in the booth. . . ." (P. 90.)

"Q. Are you saying that the recommendations of Nemoy and Baldino were not entitled to weight? What recommendations were they?

"A. As suggested by both Nelson Nemoy and Don Baldino, we may want to consider a cellular phone for immediate needs.

"Q. Yes.

"A. Well, I think from an operating standpoint, we as operators, we get a lot of recommendations from a lot of people on how to run our business. They are all meant to be helpful. At the end of the day, we've got to make our own decisions as to how things need to operate and what is best for us. When we make those decisions that is what we go with. . . ." (P. 116.)

"Q. My understanding from your testimony today and also your testimony in deposition on Friday, is that at an unknown time after the issuance of this memo you reversed your position to have a telephone; is that correct?

"A. That is correct.

"Q. You cannot place that in time, even with respect to August 5, 1994, the date by which the purchase was to have been made?

"A. That is correct. With all due respect, that is 1994. [I] guess I can estimate the time. My estimation would be probably within two weeks to 30 days after that date of that memo, we would have come up with some solution as to how we were going to handle the communications on the hold lot whether we needed a cell phone.

"Q. There was no other solution ever that came up between that date and Mr. Lyons' cardiac arrest?

"A. The solution for a hard wired phone? Is that what you are talking about?

"Q. You said you came up with a solution maybe within 30 days of the memo?

"A. I am assuming you are talking about a solution for emergency communications.

"Q. Right. But there was no solution, it was just a continuation of the walkie-talkies, was it not?

"A. I would classify that certainly as a solution. I mean to classify it as anything else would be something which wouldn't be particularly fair. . . ." (Pp. 119-20.)

"Q. Mr. Keefer, turning now to the situation as it existed on May 23, 1996, how was communication of a medical emergency at the taxi hold lot supposed to be handled so as to get a prompt emergency response?

"A. The cashier at the hold lot has a walkie-talkie, as do approximately eight to 10 other people in the terminal, either greeters at the taxi stands out at the baggage claim areas or managers and supervisors who are on the terminal. At that time of the day, it is starting to get busy, but it's not really busy yet, but this is the start of the peak, so that the cashier at the hold lot, anytime there would be an emergency, his responsibility would be to call the manager and advise them of what the nature of the emergency was. And the manager in turn would call for police support for the emergency, rescue support, whatever the situation was. It was not uncommon, as I mentioned before, for there to be frequent requests for assistance around the airport because unfortunately there were often disputes of one nature or the other between cab drivers.

"So, from that standpoint, our people were accustomed to dealing with these types of incidents and using the radio to communicate them.

"Q. What was supposed to happen next, the manager was told to call the appropriate emergency number; is that right?

"A. Yes.

"Q. What was supposed to happen after that?

"A. After that, he should relay the message to the appropriate agency as to what he knew of the situation as best he could determine. He was to then proceed to the scene wherever that would be, if it was the hold lot, the west lot, terminals A through E.

"Q. Was the manager supposed to obtain information from the cashier at the hold lot as to the nature of the emergency before he proceeded?

"A. He was to formulate, to get enough information so that he gets a sense of what the emergency is. Once he has that information, he can relay it on." (Pp. 124-26.)

Accordingly, there is no merit in the defendants' allegation of error hereinbefore noted as number 3.

### E. The Jury Had Sufficient Evidence To Find Causation

It is undisputed that it took the airport medic four minutes from the time of dispatch to arrival at the hold lot. (P-13, 5/23/96, paramedic report.) The time of dispatch was 2:48 p.m.

Edward Ralis testified that it took about 20 minutes for emergency personnel to arrive. (10/17/00 pp. 102-103.)

Sylvester Ekwunife testified that the police were the first to arrive after 15 to 20 minutes and then the ambulance arrived three to four minutes after the police. (10/17/00 p. 166.)

Mahamdou Diallo testified it was more than 20 minutes before the ambulance came. (10/18/00 p. 50).

Bernard Samuels said in his statement read at trial that he was "not sure how long it took for the medical emergency assistance to arrive, but it seemed like a very long time." (10/20/00 pp. 6-7.)

That it took at least 20 minutes for the ambulance to arrive is fully corroborated by the admissions of defendants Michael Bassett (10/17/00 pp. 122-31; pp. 135-49; pp. 172-91) and Ernest Roy (10/17/00 pp. 195-249; 10/18/00 pp. 4-12).

The testimony of Dr. Hayes fully supported plaintiff on the issue of causation. (10/18/00 pp. 144-46.)

Counsel for the defendants even argued to the jury as follows:

In his closing to the jury on October 24, 2000, counsel for defendants Parkway said (p. 106):

"I submit to you on behalf of Parkway, eight minutes is the proper standard, and I submit to you that Parkway did not go through the red light, did not go through the stop sign. On the other hand, if the time was longer than eight minutes, then that window of opportunity to save Mr. Lyons wasn't there. I would agree, ladies and gentlemen, that if it was longer than eight minutes, because Parkway was negligent, then they did not pass their duty that they owed to Mr. Lyons as a cab driver on their premises."

There was sufficient evidence that "the time was longer than eight minutes" to summon emergency aid.

Accordingly, there is no merit in the defendants' allegation of error hereinbefore noted as number 4.

## F. The Jury Had Sufficient Evidence To Find That Defendants' Conduct Increased the Risk of Harm To Plaintiff's Decedent Under Section 324A.

The defendants colloquy with the trial court (10/17/00 p. 32) is informative on this issue:

"The Court: You tell me why it is not an increased risk case under [section] 324.

"Mr. Herbst: Nothing under the facts that my client did increased the risk. In other words, it [sic] there had been a phone there we took out, that would increase the risk."

Plaintiff submitted evidence that there had been a phone there that defendants removed. Before defendants took over, the hold lot was served by a hard-wired telephone capable of making out calls. (10/24/00 pp. 12-13.) Parkway decided to cut the telephone wires in April 1994. (10/24/00 pp. 45-46.)

The testimony of Arthur Hayes M.D. fully supports the position that defendants' conduct increased the risk of harm. (10/18/00 pp. 144-46.)

Accordingly, there is no merit in the defendants' allegation of error hereinbefore noted as number 5.

## G. There Was No Basis for Pain and Suffering Under the Survival Action

Mr. Bassett gave a statement dated October 29, 1997 (P-12):

"I remained at scene until they took the cab driver away in the ambulance. The police officer applying CPR did

manage to revive to the cab driver and when he left by ambulance he was conscious."

Mr. Bassett gave a statement dated January 1, 1997 (P-16):

"The driver who had passed out was lying on the ground in the middle of the lot and as soon as Ernest and Jacob arrived, a rescue unit, two Phila. police cars and an airport facility vehicle arrived. The police had arrived first before the rescue unit and one of the officers gave the driver CPR and the driver did regain consciousness. By this time I was done closing out my shift and I had walked over to where the driver was lying. The driver was conscious as he was placed on a stretcher and into the rescue unit. I heard from one of the other drivers a day or two later that the driver was still conscious when he arrived at the hospital but then passed away while at the hospital."

P-12 and P-16 were admitted into evidence without objection. (10/20/00 pp. 16-17.)

Mr. Bassett also testified that Mr. Lyons was conscious. (10/17/00 pp. 179, 186.)

Mr. Ralis testified that when Mr. Lyons fell to the ground, "He was struggling for air. His face was darkening." (10/17/00 p. 101.)

There was circumstantial evidence to suggest that Mr. Lyon's doctors considered him potentially capable of experiencing pain, even after he was hospitalized. According to Dr. Hayes (10/18/00 pp. 156-57), at Fitzgerald Mercy Hospital, Mr. Lyons was given a paralytic agent, Pavulon. This is given because the endotracheal and IV tubes are noxious stimuli and, as a person begins to re-

gain consciousness, he may pull these tubes out through purposeful, or semi-purposeful, movements.

Accordingly, there is no merit in the defendants' allegation of error hereinbefore noted as number 9.

### H. The Jury Properly Found That Defendants' Conduct Was Not Mere Negligence But Outrageous in Nature

The jury apparently found that cutting the telephone wires under the circumstances was outrageous. Thus, there was not any finding of mere negligence and that argument has no merit.

### I. There Was Sufficient Evidence That Defendants' Conduct Was "Outrageous" Based Upon the Record in This Case

The discussion in Item H of this opinion provides ample basis for finding "outrageous" conduct so as to sustain an award for punitive damages. There is no merit in this argument.

### J. The Record Does Not Establish That Remittitur Was Required

Normally, the determination of the amount of damages that a person is to be awarded for pain and suffering, is primarily a jury question. Judicial reduction of a jury award for compensatory damages is appropriate only when the award is plainly excessive and exorbitant in a particular case. *Gunn v. Grossman,* 748 A.2d 1235 (Pa. Super. 2000) (affirming trial court's denial of request for a remittitur of jury award in wrongful death and survival actions).

The trial court may grant a request for remittitur only when a verdict that is supported by the evidence suggests that the jury was guided by partiality, prejudice, mistake or corruption. *Gunn* at 1240, citing *Krysmalski by Krysmalski v. Tamsovich,* 424 Pa. Super. 121, 147, 622 A.2d 298, 312 (1993).

The jury acted properly in rendering the amount of its verdict. Remittitur is inappropriate in the case at bar.

Accordingly, no error was committed by this court as to defendants' allegation of error hereinbefore noted as number 15.

The record provides sufficient basis for the verdict as to wrongful death and was not against the weight of the evidence.

The record hereinbefore cited makes clear that the verdict was not against the weight of evidence nor against the law. (Numbers 12 and 13.)

Since an appeal was taken with regard to a judgment which included delay damages, and since defendants filed an answer to plaintiff's motion for delay damages, it should be noted that defendants' answer was devoid of merit in that plaintiff caused no delay of the trial.

Parkway Garage Inc. and Parkway Corporation were acknowledged by all parties to have identical status as the contract with the city so acknowledged. (See agreement no. 94-6700 of 12/24/93, which purports to be between the City of Philadelphia and *Parkway Garage Inc.,* exhibit P-3, p. 1, and letter from the city to *Parkway Corporation,* dated October 2, 1995, referring to the same agreement no. 94-6700 as being between Parkway Corporation and the City of Philadelphia.) (Plaintiff's trial exhibit 3.)

Accordingly, no error was committed.